**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| LASHOUN MOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 2:05-CV-238 PPS |
| | ) | |
| LEAR CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Lashoun Moss brought this action against her former employer, Lear

Corporation, alleging discrimination and retaliation in violation of Title VII of the Civil Rights

Act of 1964 and retaliation in violation of the Family and Medical Leave Act ("FMLA") 42

U.S.C. §§ 2000e-2(a)(1), -3(a) (2000); 29 U.S.C. § 2615 (2000).  The Plaintiff asserts that she

was discriminated against based on her gender and unlawfully retaliated against for participating

in a Title VII action and for taking FMLA leave.  The matter is before the Court on Defendant's

Motion for Summary Judgment on all counts [DE 21], as well as Plaintiff's Motion to Strike [DE

33].  The Motion for Summary Judgment is GRANTED and the Motion to Strike is denied as

moot.

**I. FACTUAL BACKGROUND**

Lear operates a factory in the City of Hammond to produce seats for car manufacturers.

Moss began her employment as a production line worker at Lear's Hammond plant in March of

1995, and continued working there until her termination in June of 2004.  When the events that

immediately preceded Moss's termination occurred, she was working on the D219 production

line, and was supervised by David Maple.  Although Mr. Maple was Moss's direct supervisor, all

three of the production supervisors that worked during Moss's shift - Dave Maple, Billy Sims, and Jim McVicker - are authorized to supervise and discipline all of the production workers regardless of which production line they were assigned.  As supervisors, one of their duties is to write incident reports and turn them into Human Resources when a shop rule is violated.  From there, the HR Manager determines the appropriate punishment for the violation.  At the time of Moss's termination, Robert Darrow was the HR Manager for Lear's Hammond plant, and made the final decisions on all disciplinary matters.

**Lear's Attendance Policy**

Lear maintains an attendance policy by which employees are given points for absences from work and tardiness in arriving. An employee receives half a point if the employee works only a partial day (i.e. arrived late or left early) and one point for every day that he or she misses completely.  However, an employee who misses several days for the same reason, such as an illness, receives one point if he or she presents a doctor's note that shows the employee was seeking treatment.  At the time of Moss's eventual FMLA leave, Lear's attendance required suspension if an employee accumulated a certain level of points and termination for receiving a half point more.[1]

**Lear's Discipline Policy**

Lear's discipline policy contains twenty shop rules that if violated warrant disciplinary action. Although the rules are broken into two sections, seemingly based on the severity of the offense, the parties agree that employees may be subject to immediate termination for violating

---

[1]There is actually some confusion in the record as to whether the accumulation of eight or nine points was the event for termination as well as how many points Moss had under Lear's attendance points policy during the events relevant to the FMLA leave issue.  However, the parties do not dispute the material fact that, whatever level of points mandated termination, Moss surpassed it prior to her application for FMLA leave, discussed in greater detail below.

any of the rules or in the alternative, placed on Lear's discipline policy.  Lear's discipline policy is "progressive," containing six steps.  On the first offense an employee is given a verbal warning.  The next two offenses warrant written warnings, then a three day suspension, a five day suspension, and termination for a sixth offense.  The parties dispute whether violations that are more than a year old can be used against a worker in the progressive discipline policy.

### Events Preceding Moss' Termination

Prior to 2004, Moss was disciplined seven times for shop rule violations, but all of those violations occurred more than a year prior to her termination.  Further, several of Moss's supervisors testified that she was meeting Lear's expectations and that her behavior did not rise to a level that warranted termination.

### 1.      The FMLA Leave

On March 22, 2004, Moss requested that she be allowed to take layoff for the week and receive unemployment rather than work as scheduled, claiming she needed to see a dentist about a problem with her teeth.[2]  The HR department informed her that she would not be allowed to take layoff, as her agreement to work made her ineligible to later choose layoff and the corresponding unemployment benefits.   HR further stated that if she had to miss work, absences would be governed by Lear's absence policy, which required she be assessed one point for missing the week so long as she brought in a note from the dentist.

---

[2]  Several weeks prior to this, Lear asked its employees, based on seniority, whether they would prefer to work or take unemployment while the shop was on a layoff.  Those that chose not to work were allowed to file for unemployment, while the rest  required to work as if the plant was operating at full capacity.  Once Lear had the required number of employees to operate the lines that were going to stay open, the remaining lower seniority employees were allowed to file for unemployment.

On March 29, 2004 Moss returned to work, but informed her supervisor that she would need additional oral surgery that would require her to miss the rest of that week as well.  The supervisor acquiesced and allowed the one point to cover both weeks' worth of absences to minimize Moss's accrual of absence points.  Then, on April 2, 2004 Lear issued Moss a half point for arriving late to work. This brought her attendance points to a total which would warrant termination.  Once informed of Moss's need for extra time due to the oral surgery and that the added points pushed her over the attendance policy limit, Mr. Darrow suggested that Moss file for FMLA leave.  Mr. Darrow reasoned that if Moss's absences were covered by FMLA, they would be exempt from Lear's attendance points policy and she would fall back below the termination point level. When asked to fill out the required FMLA paperwork, Moss initially refused.  However, she eventually filled out the paperwork after being informed by HR that obtaining FMLA status was the only way for her to reduce her absentee policy point total, and thereby avoid termination.  Once the FMLA leave was approved, the 1.5 points were removed from her file.

It is not entirely clear from either parties' Statement of Facts when Moss first contacted Peter Camarata, Mr. Darrow's supervisor at Lear's corporate office.  However, it is undisputed that she contacted him and complained about both being assessed points for her oral surgery absences and other conduct by Mr. Darrow as HR manager.  On May 5, 2004 Mr. Camarata visited the Hammond plant and met with three people to discuss her complains: Moss; her union representative, Jaime Luna; and HR generalist, Martin Low.  At the meeting, Moss renewed her complaints about Mr. Darrow, expressed concern that she may be retaliated against for talking to Mr. Camarata, and was informed that the one and a half absence points she was given for the

oral surgery had been removed because she was approved for FMLA leave. Later that same day, Moss was accused of sleeping in the bathroom, but was not written up under Lear's progressive discipline policy. Moss claims that she was not sleeping but was cleaning the bathroom along with her co-worker, Shirlanda Stanfield.

### 2. The Tina Asche Litigation

In late May 2004, Lear was in the midst of preparing a Motion for Summary Judgment to defend a separate lawsuit for violating Title VII. The plaintiff in the case was a co-worker of Moss's, Tina Asche. As part of its preparation for the case, Mr. Darrow directed Mr. McVicker to ask Ms. Asche's co-workers for statements that could be helpful to Lear in the lawsuit. According to Moss, Mr. McVicker approached Moss and asked her if she knew anything bad or disparaging about Tina Asche and to write those facts down. Moss refused, and complained to her union representative, Mr. Luna, about the inquiry. Moss explained to Mr. Luna that "no supervisor is supposed to ask me anything about another employee." Although Mr. Luna is unsure if he spoke to anyone in HR about Moss's complaint, he did testify that the normal procedure when a production worker complains about a supervisor is for the union representative to talk to HR and try to work things out. When Lear filed its Motion for Summary Judgment in the Tina Asche case it attached affidavits from five of Ms. Asche's coworkers: David Pasyk; Larry Benkovich; Cheryl Huddleston; Eric Orr; and Larry Radford.

### 3. The Fan Incident

During the summer, Lear's plant is warmer inside than it is outside. On June 8, 2004, Moss and another worker, Ms. Stanfield (the same from the bathroom incident), were assigned to a new production line that was not yet equipped with fans. In response to the heat, Ms. Stanfield

5

retrieved a fan from the group still awaiting installation, and placed it in her and Moss's work area.

A short time later, Mr. Sims, the supervisor for another production line, came in and removed the fan, taking it to another production line.  Moss then left her assigned  production line and retrieved the fan from where Mr. Sims had placed it.  As she picked it up, Mr. Sims ordered Moss not to take the fan and to leave it at the end of the line.  After receiving the order, Moss carried the fan half way to her work area, thought better of it, and returned it to the area Mr. Sims indicated.

Mr. Sims notified Moss's direct supervisor, Mr. Maple, that Moss had left her work area and wrote an incident report for her refusal to follow a direct work order.  When Mr. Maple eventually approached Moss about why she had left her work area, he discovered that the fan Mr. Sims had taken earlier was again in her work station.  At that time, Mr. Maple ordered Moss to return the fan, which she did. As a result of Mr. Sims' incident report, Moss was suspended on June 8, 2004 pending an investigation and terminated on June 15, 2004 for violating shop rules Two, Twelve, and Thirteen.[3]

As it does with all its employees, the union filed a grievance in response to Moss's termination.  As part of the grievance the union requested that Moss be given a Last Chance Agreement, which Lear denied.  Lear stated it was denying the union's request because of Moss's rule violations and her long history of insubordinate behavior such as her refusal to fill out FMLA paperwork, her accusations that Mr. Darrow was trying to fire her which were later

---

[3] Rule Two is leaving work area without permission. Rule Twelve is refusing to adhere to a reasonable order.  Rule Thirteen is threatening, intimidating, coercing, abusive language, or fighting with any employee or supervisor.

determined to be false, and the incident relating to her allegedly sleeping in the bathroom.  In

October 2004, after having exhausted all of her remedies under the union's grievance

procedures, Moss filed a complaint with the EEOC alleging gender discrimination and retaliation

in violation of Title VII.  In response to the EEOC's inquiry, Lear stated that Moss was

terminated for  insubordination in conjunction with her long history of shop rule violations.

Moss points out that noticeably missing from Lear's justifications for terminating Moss is any

reference to the bathroom incident or her alleged refusal to fill out FMLA paperwork.  As a

result of the EEOC's investigation, the commission issued a right to sue letter in February 2005,

and Moss filed the complaint in this case in May 2005.

## II. DISCUSSION

### Preliminary Disputes

Prior to addressing the substance of the pending motion for summary judgment there are

a couple of preliminary matters that need to be resolved.  First, Moss objects to Lear's filing of

an additional Motion for Summary Judgment on July 19, 2007, which specifically addresses

Moss's gender discrimination claims.  Lear filed this motion several months after submitting its

original Motion for Summary Judgment on all of Moss's claims.  Moss raises the fact that the

Court-established deadline for filing dispositive motions was February 2, 2007 and argues that

Rule 6(b) permits a court the discretion to extend a filing deadline only upon a motion filed by

one of the parties.  Fed. R. Civ. P. 6(b).

 Lear's original motion, filed within the deadline, did include a request for the disposition

of all claims.  However, Lear only formally briefed the retaliation claims.  Evidently, Lear was

under the mistaken belief that Moss was no longer pursuing her claims of gender discrimination

and gender harassment.  Moss responded to the summary judgment by stating that "during

discovery the Plaintiff agreed to drop her sexual/gender harassment claims" but not her gender

discrimination claim.  *See* Plaintiff's Response to Summary Judgment at 3.  During a June 19,

2007 telephone conference, the Court ordered additional briefing on the gender discrimination

issue because there appeared to be a genuine miscommunication between the parties as to

whether Moss had dropped both her harassment *and* gender discrimination claims from her

complaint.  Local Rule 7.1(a) describes the default time parameters for responsive pleadings, and

authorizes the Court to "otherwise direct" the parties with respect to changes in response due

dates.  In this case, the Court directed the parties to submit additional briefing to flesh out the

gender discrimination issue as well as to ensure against the withholding of pertinent arguments

through inadvertent error.  In addition, the extension of time is permissible as the granting of a

request made in open court or conference, pursuant to Local Rule 6.1(b).

The second preliminary issue is Moss's Motion to Strike Lear's Exhibit P, excerpts from

the deposition of Martin Low, as well as Exhibit Q, excerpts from the deposition of LaShoun

Moss that were attached to Lear's reply brief. .  (DE 33).  The Court did not rely on either of

these exhibits in reaching its decision.  Moss's Motion to Strike is therefore denied as moot. *See*

*Hysi v. Gonzales*, 411 F.3d 847, 853 (7th Cir. 2005).

### Summary Judgment Motion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A genuine dispute about a material fact exists only "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a court construes "all facts and draws all inferences in the light most favorable to the non-moving party." *McCoy v. Maytag Corp.*, 495 F.3d 515, 520 (7th Cir. 2007).

### A.   Gender Discrimination Claim

Title VII makes it unlawful for "an employer...to discharge any individual...because of such individual's...sex..." 42 U.S.C. § 2000(e)-2(a)(1).   Moss has no direct evidence, so to prevail Moss must establish a *prima facie* case for discrimination by demonstrating that 1) she is a member of a protected class; 2) she was meeting her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) she was treated less favorably than similarly situated employees that were not in the protected class. *Barricks v. Eli Lily and Co.*, 481 F.3d 556, 559 (7th Cir. 2007).  If a plaintiff establishes a *prima facie* case, then the burden shifts to the employer to present evidence of a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  If such reason is supplied, then the employee must show that the stated reason is merely a pretext for unlawful discrimination.  *Id.*

### 1.        The Prima Facie Case

 Lear does not challenge the first or third element of the test, but does contend that Moss has not established a *prima facie* case for either the second or fourth elements. Based on the deposition testimony of Moss's various supervisors, I find that Moss has met her burden of presenting sufficient evidence to establish a *prima facie* case that she was meeting her employer's legitimate expectations.  Billy Sims, the production supervisor most heavily involved in the fan incident, testified that "[d]uring the time she worked for me, yes, she met the job

criteria and expectations, yes."  When asked his assessment of Moss as an employee, Mr. Sims

further added that "she did her job" and that he did not "have any problems with her."  David

Maple, her direct supervisor, testified that in two years of working for him, Moss lived up to

Lear's expectations but for one incident where she was written up for leaving her work area.

This is enough to establish that she was meeting Lear's legitimate expectations.

To meet her prima facie case, Moss must also point to similarly situated male employees

who were involved in the same or similar conduct and who were treated more favorably than she

was.  A similarly situated employee is "someone who is directly comparable to [Plaintiff] in all

material aspects."  *Herron v. Daimler-Chrysler, Co.*, 388 F.3d 293, 300 (7th Cir. 2004).  This

"normally entails a showing that the two employees dealt with the same supervisor, were subject

to the same standards, and had engaged in similar conduct without such mitigating circumstances

as would distinguish the employer's treat of them."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d

612, 617 (7th Cir. 2000).  Substantial similarity, not complete identity, is required. *Elkhatib v.*

*Dunkin Donuts*, 493 F.3d 827, 831 (7th Cir. 2007).  The Court's task is to apply the similarly-

situated requirement as a "common sense flexible inquiry that seeks to determine whether there

are enough common features between the individuals to allow a meaningful comparison."  *Id.* at

831; *see also*, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-405 (7th Cir. 2007).

Moss points to Efferem Lee, Chris Washington and Eric Orr as similarly situated male

employees who purportedly engaged in similar conduct but who were not terminated.  But each

of these men had significantly different disciplinary records and also engaged in conduct

decidedly different from Moss. It is a close call whether any of them are fair comparators to

Moss under the standards discussed above.  However, because there is absolutely no evidence of

pretext in this case, I will move directly to that analysis. *EEOC v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996)("[T]his court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a *prima facie* case.").

## 2. Pretext

Under the paradigm established in *McDonnell Douglas*, if a plaintiff satisfies the four-part *prima facie* test, the burden shifts to the defendant to identify a legitimate, nondiscriminatory reason for its decision. *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). Lear has done this, stating that it terminated Moss for insubordination and leaving her work area without permission. The burden then shifts back to the plaintiff, who must demonstrate that the proffered reason is merely pretext for discrimination. *Id*.

Moss has not presented any meaningful arguments in support of the existence of pretext. Employees must show evidence "sufficiently substantial to show that...a discriminatory motive was a determining factor." *Klein v. Trustees of Indiana University*, 766 F.2d 275, 282 (7th Cir. 1985). Moss claims that Lear has changed its justifications for terminating Moss and that this is a sign of a hidden, discriminatory motivation. As evidence, Moss notes that her June 2004 termination papers stated she was let go for insubordination and leaving her work station without permission. In Lear's September 2004 response to Moss's grievance, it wrote that Moss was "terminated for insubordination and refusal to obey a direct order." Lear went on, however, to describe her history of rule violations, including the bathroom and fan incidents. Later, in a December 2004 response to EEOC inquiries, it detailed the fan incident, added other

11

documented rule violations, and stated that it terminated Moss because of insubordination.

Lear's recitation of Moss's history of rule violations only served to provide greater detail to its

initial generalized statement that she was fired for both leaving her work area, and for

"insubordination."  *See Fane v. Locke Reynolds*, 480 F.3d 534, 541 (7th Cir. 2007)

("[Defendant] could have relied on all three reasons [for termination] simultaneously, regardless

of whether it emphasized one over the others at a given time.")

Moss also raises Lear's representations that Moss was untruthful during the course of

Lear's investigations into Moss's rule violations as a sign of changing justifications.  Once

again, Lear's adding of details to flesh out its original declaration of "insubordination" is in no

way inconsistent with its original rationale and not a sign of pretext.  Moss maintains that she did

not lie during either the fan or the bathroom incident investigations.  While this may or may not

be the case, there is no evidence that Lear's ***conclusion*** was anything other than that Moss had

been untruthful during those investigations.  "The focus of a pretext inquiry is whether the

employer's stated reason was honest, not whether it was accurate, wise, or well-considered."

*Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

Moss also relies heavily on the existence of a Lear progressive discipline policy and the

fact that at the time of her termination, she no longer had any points accrued against her for

previous violations of Lear's shop rules.  According to Moss, she had a clean slate on Lear's

progressive policy owing to her working for more than a year without having had a progressive

level shop rule violation placed on her record.  Moss contends that Lear's decision to terminate

instead of placing her on the lower level of discipline designated for an employee with an

otherwise clean slate is suggestive of pretext.

12

The problem for Moss is that she does not dispute that the same policy also contains language which indicates that Lear may terminate an employee immediately for violating any of shop rules One through Twenty, including Rule Two (leaving a work area without permission), Rule Twelve (refusing to adhere to a reasonable order), and Rule Thirteen (threatening, intimidating, coercing, abusive language, or fighting with any employee or supervisor). *See Fane*, 480 F.3d at 541 (finding no evidence of pretext where employer's progressive discipline policy permitted termination at any time); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 828 (7th Cir. 2006) (finding no evidence of pretext where employer's progressive discipline policy reserved right for employers to terminate employee after first offense). *Compare with Pryor v. Seyfarth, Shaw, Fairweather & Gerladson*, 212 F.3d 976, 980 (7th Cir. 2000) (holding that progressive discipline policy constituted evidence of pretext as it affirmatively precluded the plaintiff's firing). Furthermore, so long as Lear ***believed*** it was applying its discipline policy correctly, Moss has no basis to claim Lear's reasons are pretext for discrimination. *See Stewart*, 207 F.3d at 378 (finding no pretext where plaintiff only presented evidence as to whether defendant implemented its formal application policy correctly, but not to whether it believed it was implementing it correctly).

Finally, the most striking evidence negating the claim of pretext is evidence provided by Moss herself. In her Statement of Material Facts, as well as her briefing on the FMLA and Title VII retaliation/opposition claims discussed below, Moss lists not only men, but several women who she claims to be "similarly-situated" and yet were not disciplined with permanent termination. (Pl.'s Stmt Material Facts ¶¶ 47, 48, 50, 51, 56, 63, 64, 67, 68; Pl.'s Resp. In Opp. To Mot. For Summ. J. 8, 9, 15, 16, 20, 22.) The women are presented as employees who either

1) failed to obey a direct order or left their work area without permission or 2) violated more important shop rules and thus imposed a greater harm on Lear.

For example, Kimberly Sistrunk was disciplined, but not terminated, for refusal to follow a direct order from Billy Sims to get back to the line.  Billy Sims is the same supervisor who gave the direct order leading to Moss's own termination. Alesia Moses received suspensions for multiple violations of a "reasonable" order (which Moss maintains is the same as a "direct" order), and subsequently suspended again for issuing threatening and abusive language to a co-employee.  Within the same year, Ms. Moses was terminated for violating other rules, but regained her job under a Last Chance Agreement stating that "there would be one further suspension with the understanding that any further rule violations would result in termination..." Nevertheless, Ms. Moses was again disciplined, but still not even suspended, for staying in the lunch room and playing games, instead of being at her work station during work hours.  By pointing the court to other *women* who were treated better than she was, Moss has effectively proven that Lear treated similar men and women equally and without discrimination.  In other words, it is apparent that Lear made individualized decisions on employee discipline irrespective of gender.  Absent evidence of discrimination, courts are not here to second guess those decisions.  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (the Court is "not to sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined").

**B.     Retaliation Claims Under Title VII and FMLA**

Title VII protects employees from retaliation for standing up to employers who violate the statute.  42 U.S.C. § 2000e-3(a).  The anti-retaliation provision advances Title VII's

14

objective to create workplaces free of discrimination by preventing employers from interfering with an employee's attempts to enforce or advance the act's specific guarantees. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412 (2006). The Family and Medical Leave Act ("FMLA") also prohibits employer retaliation against employees for asserting their rights under the act or opposing practices that are made illegal by the act.  29 U.S.C. § 2615(a). The Court examines retaliation claims under all employment discrimination statutes, including Title VII and the FMLA, in exactly the same way, and a plaintiff may utilize either the direct or indirect method of proof to survive summary judgment regardless of which statute the claim is based upon.  *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n. 5 (7th Cir. 2006).

Under the direct method, a plaintiff must show he or she: 1) engaged in a protected activity; 2) suffered an adverse employment action; and 3) that there is a causal connection between the two. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006);  *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904 (7th Cir. 2005).  Alternatively, a plaintiff may use the indirect method of proof for retaliation, a slight adaptation of the traditional *McDonnell Douglas* framework.  *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  To prevail under the indirect method, the plaintiff must establish a *prima facie* case for discrimination by demonstrating that he or she: 1) engaged in a protected activity; 2) was meeting the employers legitimate expectations; 3) suffered an adverse employment action; and 4) was treated less favorably than similarly situated employees that did not engage in the protected activity. *Tomanovich*, 457 F.3d at 663.  Like gender discrimination, once the plaintiff shows a *prima facie* case of retaliation, the burden shifts to the plaintiff to proffer a non-discriminatory reason for the adverse employment action. *Id.*  If the employer is able to proffer a

15

non-discriminatory reason, the burden shifts back to the plaintiff to show that the employer's proffered reasons are merely a pretext to the real reason. *Id.*

Beyond the elements set forth in both the direct and indirect method of proof, each method carries an inherent requirement that the decision maker have actual knowledge of the protected activity. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (stating that under the direct method the causation prong contains an inherent requirement of knowledge because if a defendant was unaware of the plaintiff's protected activity the adverse employment action could not have been caused by it); *Tomanovich*, 457 F.3d at 668-69 (stating that under the indirect method the requirement of knowledge is presupposed because if an employer is unaware of the employee's protected activity the employer is unable to penalize the employee for it).

In the present case, Moss asserts four retaliation claims: two under Title VII and two under the FMLA.  To survive summary judgment, Moss proceeds under both the direct and indirect methods of proof for each claim.  Accordingly, the Court will deal with each claim and method of proof separately.

### 1.     Retaliation for Refusing to Participate in the Tina Asche Litigation

Moss's first claim is that Lear retaliated against her for refusing to give a statement in the Tina Asche litigation. Moss argues that she has presented enough evidence under both the direct and indirect method to withstand summary judgment.  As previously stated, under both methods Moss must begin by showing she has engaged in a protected activity.  *Tomanovich*, 457 F.3d at 662.

Title VII's general retaliation provision protects two types of activities from employer retaliation. 42 U.S.C. § 2000e-3(a) (2000); *Mattson v. Caterpillar Inc.*, 359 F.3d 885 (7th Cir.

2004).  For this claim, the applicable clause is the participation clause, which prohibits

retaliation against an employee for participating in any manner in an investigation, proceeding,

or hearing under Title VII, including bringing a charge against an employer for violating Title

VII or assisting a fellow employee in his or her Title VII action.  42 U.S.C. § 2000e-3(a).  The

question remains, however, as to whether an employee's refusal to assist an employer in

defending a Title VII suit, i.e., "non-participation," falls within the ambit of the participation

clause, thereby protecting the employee from retaliation.  While the Seventh Circuit, like many

of the other circuits, has yet to decide whether "non-participation" qualifies for protection under

the participation clause, the Sixth Circuit has done so.  *Merkel v. Scovill Inc.*, 787 F.2d 174 (6th

Cir. 1986).

     *Merkel* involved an employee who was fired for refusing to participate in an Ohio Civil

Rights Commission ("OCRC") investigation of alleged age discrimination filed by one of Mr.

Merkel's coworkers.  *Id.* at 176.  In order to investigate the matter, Scovill Inc. held several

meetings in which Mr. Merkel attempted to answer questions about an incident involving him

and the complainant. *Id.*  After the meetings, a secretary for Scovill Inc. compiled an affidavit of

Mr. Merkel's statements and gave it to him to sign and submit to the OCRC.  *Id.*  Mr. Merkel

reviewed the affidavit and refused to sign it, claiming that it contained inaccurate statements.  *Id.*

Scovill Inc. then discharged Mr. Merkel for giving inconsistent statements and refusing to

cooperate in the investigation.  *Id.*

     The court held that refusal to participate is generally not a protected activity because the

plain meaning of the ADEA's anti-retaliation provisions, which mirror those of Title VII, only

protect "actual" participation in an employment discrimination action.  *Id.* at 180.  However, the

17

*Merkel* court recognized two exceptions to this holding: when an employer pressures an employee to give a statement it knows or should know to be false; or when an employer pressures an employee to give statements or evidence the employer does not reasonably believe the employee possesses. *Id.* Finding that neither of these circumstances existed in *Merkel*, the court reversed the district court's holding that Mr. Merkel's refusal was a protected activity. In essence, *Merkel* stands for the proposition that if an employer is frustrating the purposes of Title VII, then non-participation by an employee can be actionable. This Court finds the reasoning in *Merkel* persuasive.

Moss has not alleged that Lear was attempting to pressure her into making statements that it knew or should have known were false, nor is there evidence that Lear had reason to believe Moss did not have the information requested of her. Accordingly, Moss's refusal to give a statement did not constitute protected activity under Title VII's participation clause, and Moss's claim must fail under both the direct and indirect methods.

### 2.    Retaliation for Complaining About Tina Asche Investigation

Moss's second claim for Title VII retaliation is that she was unlawfully retaliated against for complaining to her Union Grievance Representative, Jamie Luna, about Lear's request for information about Tina Asche. Unlike Moss's previous claim, this claim falls under Title VII's "opposition clause." The opposition clause prohibits retaliation against an employee for opposing an employment practice that is made illegal by Title VII. *Moser*, 406 F.3d at 903. The Seventh Circuit has expanded its protection to include not only opposition to actual illegal practices, but to employer actions that are not violations of Title VII. *Fine v. Intern. Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). In *Fine*, the court stated that opposition to an employer's action

which is not a violation of Title VII may be a protected activity only if the employee's belief that the employer's action violated Title VII is reasonably and sincerely held.  *Id.*

Lear's request for information from its employees is not an actual violation of Title VII as an employer has a right to prepare a defense in Title VII litigation.  Therefore, Moss must show that she had a reasonable and sincere belief that Lear's inquiry violated Title VII.  She is unable to do.  Moss fails to point to any evidence that suggests she believed Lear was violating Title VII.  The Court's independent review of the record only reveals evidence that she was unhappy about the questioning not that she believed it to be a violation of any employment discrimination laws to engage in the questioning.  Furthermore, even if Moss could point to evidence suggesting that she sincerely believed Lear was violating Title VII, her claim would still fail because any such belief would not be reasonable.  Accordingly,  Moss's claim of retaliation for complaining about Lear's questioning fails under both the direct and indirect methods.

### 3.        Retaliation for Taking FMLA Leave

Moss's third claim is that she was unlawfully retaliated against for taking FMLA leave.[4] Moss attempts to establish this retaliation claim through both the direct and indirect method.  As stated above, under the direct method of proof Moss must show: 1) that she engaged in a protected activity; 2) she suffered an adverse employment action; and 3) there is a causal connection between the two. *Tomanovich*, 457 F.3d at 662.  Because Lear has conceded the first

---

[4]The FMLA leave serving as the basis for Moss's FMLA retaliation claims is the set of days she took off for her oral surgery.  Although the record shows that Moss complained to Human Resources about receiving points on the her attendance policy for taking the days off, her complaining took place before she switched to FMLA status. In fact, she filled out the FMLA paperwork at Lear's own suggestion and Lear removed the points after she did so.

two elements of this method, the Court moves straight to whether Moss has established a causal connection between the protected activity and the employment action.

In order to prove causation under the direct method a plaintiff has two options.  First, the plaintiff may present direct evidence to show the defendant retaliated against her.  This generally consists of "smoking gun" evidence where the employer somehow admits that they retaliated against the employee. *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  A plaintiff may also rely on a combination of circumstantial evidence which creates a "convincing mosaic" from which a trier of fact could conclude that there is a causal connection.  *Id.*  In order to create a "convincing mosaic," the plaintiff may rely on evidence such as: ambiguous statements; suspicious timing; discrimination against other employees; and other tidbits of evidence which tend to show a causal link. *Id.*  Taken separately they may not be enough to show causation, but taken as a whole they point directly to a discriminatory reason for the employer's action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Moss has not provided any direct evidence that Lear's decision to terminate her was motivated by her taking FMLA leave.  However, Moss points to several pieces of circumstantial evidence which she contends establish a "convincing mosaic" and precludes summary judgment including: Lear's shifting justification for her termination; the temporal proximity of her refusal and her termination; other production workers who have committed the same or worse rule violations and were not terminated; testimony from former and current supervisors that she was meeting Lear's legitimate expectations; and that rule violations older than a year were used against her in contravention of Lear's typical disciplinary procedures.

The Court is unpersuaded that these pieces of circumstantial evidence constitute the high standard of a "convincing mosaic." To begin with, Moss does not point to any ambiguous statements by Lear, nor does she provide examples of retaliation against other employees that took FMLA leave. While Moss does point to the temporal proximity between her FMLA leave and her termination, suspicious timing alone is rarely enough to prove causation under the direct method. *Tomanovich*, 457 F. 3d at 665. The Supreme Court has also held that proving causation through temporal proximity requires that the two be very close. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Here, Moss was fired almost a month and a half after taking FMLA leave. This is not close enough to prove causation by itself. The rest of Moss's "convincing mosaic" is a repackaging of the indirect method's elements, and even taken as a whole, Moss's circumstantial evidence fails to point directly to a discriminatory reason for her termination. Therefore, Moss has failed to create a "convincing mosaic" of circumstantial evidence, and must rely on the indirect method in order to survive summary judgment.

Moss also attempts to establish her claim for retaliation for exercising her FMLA rights under the indirect method of proof. As previously stated, she must first establish a *prima facie* case by showing the four elements identified in *McDonnell Douglas*. Here Moss's claim fails because she has not shown similarly-situated employees that did not engage in the protected activity. Moss points to many employees that were cited for various rule violations and not terminated. Even if this Court held that all of the employees listed by Moss are sufficiently similar in all relevant aspects, her claim would still fail because Moss has not presented evidence on the critical independent variable: which employees did or did not take FMLA leave. This deficiency is fatal to her claim. *Hill v. Stoughton Trailers, LLC.*, 445 F.3d 949, 952 (7th Cir.

21

2006) (holding that the plaintiff failed to meet the similarly situated requirement for FMLA

retaliation, despite a long list of coworkers that were not terminated after committing the same or

similar rule violation, because he did not identify whether or not any of the coworkers listed had

taken FMLA leave).  As a result Moss has failed to meet her burden of producing similarly

situated employees that were treated better *and* did not engage in the protected activity. In

addition, for the reasons stated above as it related to her gender discrimination claim, Moss has

failed to show that Lear's stated reasons for terminating her were pretext.

**4.      Retaliation Claim for Complaining About Lear's Handling of FMLA Leave**

Moss's fourth and final claim of retaliation is an opposition claim for complaining to Mr.

Camarata about accruing absence points while on FMLA leave.  This claim, however, suffers the

same infirmities as her other FMLA retaliation claim.  Under the direct method Moss cannot

show causation because she lacks direct evidence and is unable to create a "convincing mosaic"

of circumstantial evidence.  Under the indirect method Moss also fails because she has not

shown that any of the employees who received better treatment had ever taken FMLA leave or

made complaints about how their absences were treated under Lear's attendance policy.

Therefore, Moss  has failed to establish a prima facie case of retaliation in this FMLA claim as

well. Finally, as with the other claims, there simply is no evidence that Lear's stated reason for

terminating Moss was a pretext.

### III. CONCLUSION

For all of the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 21]

is **GRANTED** for all counts, including Plaintiff's claim of gender discrimination.  Defendant's

Motion for Summary Judgment for gender discrimination [DE 40] is **DENIED** as moot, as the

motion is disposed of through the Court's ruling on Defendant's original Motion for Summary Judgment.  Furthermore, Plaintiff's Rule 56 Motion to Strike [DE 33] is **DENIED**.  Lastly, Defendant's request to deem admitted the entirety of its Statement of Material Facts [DE 31] is **DENIED.**  The clerk shall **ENTER FINAL JUDGMENT** in favor of the Defendant Lear and against Plaintiff Moss.  The clerk shall treat this civil action as **TERMINATED.**  All further settings in this action are hereby **VACATED.**

> **SO ORDERED.**

> ENTERED: September 28, 2007

<div style="margin-left:40%">s/ Philip P. Simon<br>PHILIP P. SIMON, JUDGE<br>UNITED STATES DISTRICT COURT</div>